[No. A084831. First Dist., Div. Two. Jan. 11, 2000.]

BRIAN BJORK, a Minor, etc., Plaintiff and Appellant, v.
DAVID M. MASON, Defendant and Respondent.

COUNSEL

Law offices of Hansen & Jones, Monte L. Hansen and Mark T. Clausen for Plaintiff and Appellant.

Cox, Wootton, Griffin & Hansen, Terence S. Cox and Karen M. Houston for Defendant and Respondent.

OPINION

HAERLE, Acting P. J.—

## I. INTRODUCTION

This is an appeal by a boy who was injured when a towrope attached to an inner tube in which he and another boy were riding, and which was being

pulled by a boat owned and driven by respondent, broke and snapped back, hitting him in the eye. The trial court held that the case was covered by the primary assumption of risk doctrine articulated in *Knight v. Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*) and, on that basis, granted respondent summary judgment. We reverse.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On July 17, 1997, appellant, then age 15, along with four other boys, ages 11 to 15, went to Lake Berryessa, Napa County, where they spent the day in various water sports, mainly involving waterskiing and inner-tubing behind a boat owned and driven by the second cousin of three of the boys, respondent Mason. Mason, a self-employed adult, lives in Novato, Marin County, as did the five boys he took with him to the lake that day.

At the time, Mason owned a 19-foot, 1981 Ski Centurion boat powered by a 275 horsepower motor which he often used for waterskiing on, e.g., Lake Berryessa, Lake Shasta and the Sacramento River Delta. In his deposition, he testified that he had at least 25 years of experience in recreational boating, including pulling water-skiers and people riding in inner tubes.

On the day in question, Mason was not being paid for any of his time or effort. Indeed, as noted, three of the five boys he took with him on the day in question were his second cousins. The group spent the morning and the early portion of the afternoon with Mason (and him only) driving his boat and the boys taking turns both waterskiing and being pulled in the inner tube (tubing). Each type of activity consumed about 50 percent of the time, Mason testified. In connection with the tubing part of the day's activities, Mason's only instructions to the five boys were: "Wear a life vest and try to stay on."

The inner tube apparatus Mason used for that part of the day's recreation was owned by him and brought by him to the lake. It consisted of a combined inflated rubber tube and attached rope. Mason had no idea how or when he acquired this unit; he testified that it "just showed up amongst my ski equipment." He did not know if he had owned it for more than five or 10 years, stating "I just don't know when it showed up." However, he had not used the device previously in 1997. He did not recall if he had used it at all the previous year, but noted that he "used it very seldom." In the off-season, he stored the unit, enclosed in a special container, in his father's attic. On the day in question, he inspected the tube and rope; both appeared to be "in safe condition."

Some of the tubing in the morning involved two boys in or on the tube, with Mason's boat pulling it and them. Appellant had been one of two boys

on it during one such prior occasion. Sometime early in the afternoon the group resumed tubing and appellant and one of the other boys, Robert Stafford, got on the tube together. Their combined weight was estimated at about 260 pounds, or the equivalent of one large man; Mason thought this was a safe weight. With Mason driving, the boat proceeded through a "No Wake" zone marked by buoys; in this zone, the boat's speed was legally limited to five miles per hour so as to avoid creating a wake. However, near the end of the zone, Mason twice briefly accelerated the speed of the boat two or three miles per hour above that level so as to increase the movement of the tube and, thus, the enjoyment of its passengers. At the second of these accelerations, the towrope broke; the broken end flew backwards and struck appellant in the eye, injuring him.

Mason testified that he had experienced or seen broken towropes many times in his extensive experience with waterskiing and tubing. However, he had never previously had anyone hurt while tubing, and had seen only one injury involving waterskiing.

Two expert witnesses retained by appellant opined that (1) the towrope which broke was "very old" (perhaps 10 years old) and frayed, (2) a towrope should be replaced whenever it appears frayed and damaged and, in any event, at least every two years, and (3) it is important to use a towrope that is appropriate for the weight being towed.

Appellant, via his guardian ad litem father, filed a complaint stating a single cause of action for negligence in Marin County Superior Court on October 2, 1997. Respondent filed a general denial, specifically pleading assumption of risk. After discovery, including the depositions of both parties, respondent moved for summary judgment. After further briefing and oral argument, the motion was granted on July 22, 1998, and judgment for the respondent entered on September 21, 1998. This timely appeal followed.

III. Discussion

A. *Standard of Review*

A motion for summary judgment "shall be granted [by the trial court] if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) However, summary judgment shall not be granted by the court based on inferences reasonably deducible from the evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact. (*Ibid.*) To obtain summary judgment, a

defendant must show either that one of the required elements of the plaintiff's case cannot be established or that "there is a complete defense to that cause of action." (Code Civ. Proc., § 437c, subd. (o)(2).) If the defendant meets this burden, the burden then shifts to the plaintiff to "set forth the specific facts showing that a triable issue of material fact exists," in order to rebut the defendant's showing. (*Ibid.*)

■■■ Appellant challenges the trial court's grant of summary judgment, contending that a triable issue of fact exists as to whether the doctrine of assumption of risk applies. ■■ Since determining whether the primary assumption of risk doctrine applies resolves the question of whether a duty of care exists, it is "a *legal* question . . . to be decided by the court . . . ." (*Knight, supra,* 3 Cal.4th at p. 313.) We therefore review the trial court's grant of summary judgment de novo "to determine whether the defendant has conclusively negated a necessary element of the plaintiff's case or demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial." (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673-674 [25 Cal.Rptr.2d 137, 863 P.2d 207].)

## B. *Primary Assumption of Risk*

■■■ The trial court found that the primary assumption of risk doctrine obtained here and barred recovery by appellant. Appellant asserts that this ruling was erroneous because, he asserts (1) there was and is a triable issue of fact as to whether respondent increased the risks inherent in tubing by his action in twice accelerating the boat a few miles per hour over the posted speed limit before he had completely exited the restricted speed zone, and (2) the breaking of a towrope is not an inherent risk of waterskiing or tubing.

Respondent supports the trial court's ruling, contending that the parties to this litigation were coparticipants in a sporting activity of the sort that implicates the primary assumption of risk doctrine and that his own behavior did not rise to the level required to exempt him from the protection afforded a sport coparticipant by that doctrine.

To sort out all this, we must start with our Supreme Court's 1992 decision in *Knight.* There, a plurality of the court ruled that a participant in a touch football game involving both men and women was barred by the doctrine of primary assumption of risk from recovering from injuries she suffered therein. Labeling her a "coparticipant" in the particular sport involved, the court held: "[W]e conclude that a participant in an active sport breaches a legal duty of care to other participants—i.e., engages in conduct that properly may subject him or her to financial liability—only if the participant

intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport." (*Knight, supra*, 3 Cal.4th at p. 320.)

Simultaneously with the filing of *Knight*, the court decided *Ford v. Gouin* (1992) 3 Cal.4th 339 [11 Cal.Rptr.2d 30, 834 P.2d 724, 34 A.L.R.5th 769] (*Ford*). This case is even more instructive in the present circumstances, as it involved not touch football players but two men involved in waterskiing, the plaintiff being the skier and the defendant the driver of the boat. The former was skiing both barefoot and backwards in a channel of the Sacramento River Delta, and was severely injured when his head hit a tree limb. He sued the defendant, claiming his injuries resulted from the defendant's steering the boat too close to the wooded shoreline. Before the Supreme Court, he contended that any assumption of risk doctrine "should not apply in the context of a 'cooperative' sport such as waterskiing." (*Id.* at p. 345.) The court disagreed: "Although most of the prior authorities cited in *Knight* did involve sports that are played by competing teams, the rationale of those decisions is, in our view, equally applicable to an active sport such as waterskiing even when it is engaged in on a noncompetitive basis. [¶] As noted in *Knight*, the decisions that have recognized the existence of only a limited duty of care in a sports situation generally have reasoned that vigorous participation in the sport likely would be chilled, and, as a result, the nature of the sport likely would be altered, in the event legal liability were to be imposed on a sports participant for ordinary careless conduct. [Citation.] This reasoning applies to waterskiing. Even when a water-skier is not involved in a 'competitive' event, the skier has undertaken vigorous, athletic activity, and the ski boat driver operates the boat in a manner that is consistent with, and enhances, the excitement and challenge of the active conduct of the sport. Imposition of legal liability on a ski boat driver for ordinary negligence in making too sharp a turn, for example, or in pulling the skier too rapidly or too slowly, likely would have the same kind of undesirable chilling effect on the driver's conduct that the courts in other cases feared would inhibit ordinary conduct in various sports. As a result, holding ski boat drivers liable for their ordinary negligence might well have a generally deleterious effect on the nature of the sport of waterskiing as a whole. Additionally, imposing such liability might well deter friends from voluntarily assisting one another in such potentially risky sports. Accordingly, the general rule limiting the duty of care of a coparticipant in active sports to the avoidance of intentional and reckless misconduct, applies to participants engaged in noncompetitive but active sports activity, such as a ski boat driver towing a water-skier. Under the principles set forth in *Knight*, summary judgment in favor of defendant was properly entered." (*Ford, supra*, 3 Cal.4th at p. 345.)

Focusing even more specifically on the sporting activity involved here is the very recent decision of a panel of Division Five of the Second District, *Record v. Reason* (1999) 73 Cal.App.4th 472 [86 Cal.Rptr.2d 547] (*Record*). There, four adults, including the plaintiff and defendant, went waterskiing and tubing on Castaic Lake in Southern California. The plaintiff was injured when he fell from the tube during what he claimed was an abrupt and fast turn executed by the defendant, the owner of the tube and the driver and part owner of the boat. The court held, with one dissent,[1] that the trial court was correct in granting summary judgment to the defendant on the basis of the primary assumption of risk doctrine.

The *Record* court had relatively little difficulty concluding, largely on the basis of the holding in *Ford, supra,* 3 Cal.4th 339, that tubing was a type of sporting activity covered by the doctrine. It noted: "Compiling all of the distinguishing factors, it appears that an activity falls within the meaning of 'sport' if the activity is done for enjoyment or thrill, requires physical exertion as well as elements of skill, and involves a challenge containing a potential risk of injury. From the evidence presented, tubing meets these criteria. Egstrom, in his declaration, described the equipment used, the force and speed experienced by the rider even when the boat is going at recommended speeds, the skill needed by the boat operator, and how the rider's position affected his ability to stay on. In his deposition, appellant described the enjoyment a rider receives from tubing as ranging from, the 'simple pleasure' of being casually towed behind the boat to the 'thrill' of the boat turning rapidly to get the inner tuber to go much quicker. Inner tubing thus appears to be a variation of water-skiing designed to accommodate those eager to experience the force of whipping around the wakes but lacking the ability to water-ski. Combating centrifugal force with a white knuckled grip on the tube handles entails at least as much physical exertion as sport fishing. Skill in developing a steadfast grip and feel for the tube as it travels is required, and an experienced tube rider will obviously have a greater ability to stay on the tube than a beginner. For these reasons, we hold that tubing is a sporting activity subject to primary assumption of risk." (*Record, supra,* 73 Cal.App.4th at p. 482.)

We agree with this analysis and adopt it here.

---

[1] This issue which provoked the dissent was whether there was a triable issue of fact as to whether the plaintiff's preride request to the defendant to "go slow and take it easy" because of a preexisting back injury could form the basis for an "explicit understanding" to vary the norms of the sport such that would vitiate application of the primary assumption of risk doctrine. (*Record, supra,* 73 Cal.App.4th at pp. 482-484 and 487-491.) Nothing similar to that issue is implicated here.

Another issue dealt with in *Record* was whether a driver of the boat is a coparticipant in the sport of tubing. Unlike appellant here,[2] the defendant-boat driver in *Record* contended he was not. The court observed: "[A]ppellant contends that the control the boat driver has over the tube rider's speed and direction removes tubing from primary assumption of risk because the boat driver is not a coparticipant with the tube rider but controls the tube rider's activity. He likens the relationship to that of instructor and pupil. [Citations.] [¶] Appellant's attempt to analogize respondent to an instructor or supervisor lacks merit. Appellant was not under the tutelage of the respondent, and respondent had no position of authority over him. They were friends who chose to take a trip together to a lake to engage in a mutually enjoyable sport. 'Under the reasoning of *Knight*, participants are . . . those actively engaged in the game or other activity.' [Citation.] In *Ford* v. Gouin, *supra*, 3 Cal.4th at page 345, the court held that the boat driver was a coparticipant in the sport of waterskiing. A boat driver is equally as integral to tubing as to waterskiing. [Citation.] We see no reason to question respondent's status as a coparticipant." (*Record, supra,* 73 Cal.App.4th at pp. 485-486.)

Based both on this precedent and respondent's concession, we conclude that respondent occupied coparticipant status with appellant.[3]

[2]Respondent's counsel impliedly conceded that his client was a coparticipant in his opening brief, and confirmed that concession in oral argument.

[3]This conclusion is not, however, as clear here as it was in *Record.* Here, five young boys, all ages 11-15, were waterskiing and tubing under the guidance of one adult, respondent. The latter was the exclusive driver of the boat, which he owned. He was, in a very real sense, in control of all the water sports activities the group engaged in that day. And being in control of others has often been seen to be inconsistent with coparticipant status. The most obvious cases are those involving coaches, instructors or commercial operators on the one hand and students, trainees or customers on the other. The whole assumption of risk doctrine is applied quite differently in such circumstances. (See, e.g., *Tan* v. *Goddard* (1993) 13 Cal.App.4th 1528, 1534-1536 [17 Cal.Rptr.2d 89] *(Tan)*; *Galardi* v. *Seahorse Riding Club* (1993) 16 Cal.App.4th 817, 822-824 [20 Cal.Rptr.2d 270] *(Galardi)*; *Ferrari* v. *Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 254-255 [38 Cal.Rptr.2d 65]; *Allan* v. *Snow Summit, Inc.* (1996) 51 Cal.App.4th 1358, 1368-1372 [59 Cal.Rptr.2d 813].) One of the principal reasons for the different rule in such cases is that, in them, the coach, instructor, ski resort or the like is perceived as the "party who controls the activity." (*Bushnell* v. *Japanese-American Religious & Cultural Center* (1996) 43 Cal.App.4th 525, 533 [50 Cal.Rptr.2d 671]; see also *Allan* v. *Snow Summit, Inc., supra,* 51 Cal.App.4th at p. 1370 and *Wattenbarger* v. *Cincinnati Reds, Inc.* (1994) 28 Cal.App.4th 746, 754-755 [33 Cal.Rptr.2d 732].)

But it does not follow that when there is substantial control of a sporting event by one party, that party is necessarily ineligible for coparticipant status under the primary assumption of risk doctrine. Thus, although here there is no question that respondent was in control of the day's water activities, it is also clear that, as one who has "had boats all my life" and "take[s] children skiing a lot," respondent found pleasure and enjoyment and in operating his boat on the sort of occasion in question. Thus, even absent his concession, we would conclude that respondent was a coparticipant for purposes of the analysis mandated by *Knight.*

Such being the case, one of the bases urged by appellant for reversal may be disposed of rather easily. It is that, by twice accelerating his boat a few miles per hour above the posted limit so as to "[have] fun with the kids," respondent improperly increased the risks inherent in the sport of tubing and is thus ineligible to rely on the primary assumption of risk defense. We have no difficulty in rejecting this contention. If the primary assumption of risk doctrine has any substance at all, it cannot preclude the sort of minimal transgression appellant complains of regarding the two minor and brief accelerations of the boat. Indeed, almost exactly this point was dealt with in *Record*: whether the speed and turn angle utilized by that defendant at the time that plaintiff was thrown by the tube raised a triable issue of fact as to whether those actions "increased the risks inherent in the sport." (*Record, supra*, 73 Cal.App.4th at p. 484.) Again relying on the very similar fact situation of *Ford*, the court held they did not: "Even assuming, as we must for summary judgment review purposes, that the boat was traveling five to ten miles per hour over the recommended speed limit for towing adults in the tube and that respondent made a sharp, three-quarter turn, respondent's activity was merely negligent, 'an "inherent risk" of [the] sport,' barring recovery for the appellant. (*Knight* . . . , *supra*, 3 Cal.4th at p. 316.) Holding a boat driver to a duty to ensure the tube rider does not fall off the tube would inevitably chill the driver's willingness to provide the exciting ride which appears to be necessary to tubing and narrow the spectrum of excitement, changing the fundamental nature of the sport. Appellant did not meet his burden of showing that the alleged conduct was outside the boundaries of the sport." (*Record, supra*, 73 Cal.App.4th at p. 485; see also *Ford, supra*, 3 Cal.4th at p. 345.)

We agree and hold that, for the same reason, the alleged minor "accelerations" by respondent while exiting the "no wake" zone cannot form a basis for liability to appellant under the primary assumption of risk doctrine.

But respondent was something more than a coparticipant for purposes of this case: he was also the supplier of all of the equipment used on the day in question, and a failure of one piece of that equipment caused the injury at issue. As noted earlier, appellant's second contention is that a broken towrope is not an inherent risk of the sport of tubing, relying on the declarations of the two experts noted above. We will now address that issue.

Respondent answers this second contention by (1) citing his uncontradicted testimony that he had seen many broken towropes in both waterskiing and tubing and (2) arguing that the test of liability pertinent to coparticipants is whether the defendant's conduct was intentional or reckless. Unfortunately, both parties are able to cite language in *Knight* to support their respective positions regarding the pertinent test of liability.

At one point in *Knight*, the court generally described the responsibility of persons involved in sports and sporting facilities as being "not to increase the risks to a participant over and above those inherent in the sport." (*Knight, supra*, 3 Cal.4th at p. 316.) Inherent risks are assumed by a participant, the court went on; risks over and above those are not necessarily assumed. Appellant quotes these passages from *Knight* and then asserts that a broken towrope (like the faulty ski resort towrope noted in the same passage of *Knight*) is not an inherent risk of the sport of tubing.

Respondent responds by quoting language a few pages later in *Knight* where the court dealt directly with the test applicable to coparticipants. In those passages, the court held that a participant may be liable to a coparticipant for injuries the latter suffers if, but only if, "the participant intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport." (*Knight, supra*, 3 Cal.4th at p. 320; see also *id.* at pp. 318-319.)

We concede that the two tests thus articulated a few pages apart in *Knight* are a bit confusing.[4] But we believe that the correct test is the second one, i.e., that set forth in the portion of the opinion dealing specifically with the liability of coparticipants in sports. As applied here, that test means that respondent can only be liable to appellant for injuries caused the latter by any intentional or reckless actions *undertaken in his or her capacity as a coparticipant.* We stress this latter point because we believe that, as and when a person supplies equipment to be used in a sport, even if he or she thereafter becomes a coparticipant in the sport, *the act of supplying the equipment is something separate and distinct from participation in the sport and the tests for liability are accordingly different.*

First of all, every one of the assumption of risk cases that has even come close to discussing equipment failures has made clear that these are covered by general negligence rules and not by the primary assumption of risk doctrine. In *Knight* itself, as already noted, the court explicitly distinguished between the case of a ski resort not smoothing out moguls on a ski

---

[4]They may well have confused some of our sister courts. For example, in a single paragraph in *Allan v. Snow Summit, Inc., supra*, 51 Cal.App.4th at page 1368, the court quotes *both* iterations of the test articulated in *Knight*. And in the very recent case of *Campbell v. Derylo* (1999) 75 Cal.App.4th 823 [89 Cal.Rptr.2d 519] (*Campbell*), a panel of the Third District utilized the "increase the risks over those inherent in the sport" test to reject the defense of primary assumption of risk in a case involving a defendant snowboarder who failed to use a retention strap with his snowboard, resulting in the device speeding down the hill by itself, striking the sitting minor plaintiff. The court conceded that the two were coparticipants (*id.* at p. 827, fn. 1), but did not thereafter consider whether the defendant's conduct fell within the "intentional or reckless" category.

run and letting its towropes deteriorate. (*Knight, supra,* 3 Cal.4th at pp. 315-316.) And in several of the coach/instructor cases (although a fortiori not involving coparticipants), the courts have stressed the duty of the defendant "not to supply faulty equipment." (*Wattenbarger v. Cincinnati Reds, Inc., supra,* 28 Cal.App.4th at p. 755; cf. also *Galardi, supra,* 16 Cal.App.4th at pp. 822-824 [horse-jumping instructor raising the levels of the hurdle too high]; *Tan, supra,* 13 Cal.App.4th at pp. 1534-1536 [stable allowing plaintiff student to ride a horse which was "off" in its behavior].)

And even where coparticipants are involved, one recent case has effectively held that the failure of a defendant to have and utilize the correct equipment (a retention strap on his snowboard) was critical. It meant, the court said, that the "doctrine of primary assumption of the risk is not an absolute bar to recovery . . . , because the lack of a retention strap could be found by a jury to have increased the risk of harm to plaintiff beyond what was inherent in the sport of skiing." (*Campbell, supra,* 75 Cal.App.4th at p. 830.)[5]

Although no assumption of risk case of which we are aware has specifically so held, we think this reluctance to treat injuries caused by equipment failures similarly to injuries caused purely by coparticipant action is both correct and supported by general tort law. We note in particular the language of Restatement Second of Torts section 405: "One who directly . . . gives or lends a chattel for another to use, knowing or having reason to know that it is or is likely to be dangerous for the use for which it is given or lent, is subject to the same liability as a supplier of the chattel." (See also, to the same general effect, Rest.2d Torts, § 388.) Citing section 388, Witkin states that the Restatement Second of Torts "recognizes a general liability on the part of *anyone supplying chattels,* whether as *seller, lessor, bailor, repairer, donor* or *lender . . . ."* He goes on to note that California follows this rule. (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 949, p. 333; see also *id.* at § 958, pp. 342-343.)

This principle has been recognized in assumption of risk cases. Thus, in *Ferrari v. Grand Canyon Dories, supra,* 32 Cal.App.4th 248, a case involving a passenger on a river rafting trip who was injured when she fell against a metal frame on the raft, the court stated: "Defendants' obligation not to increase the risks inherent in the activity included a duty to provide safe equipment for the trip, such as a safe and sound craft." (*Id.* at p. 255.) As suggested by section 405 of the Restatement Second of Torts, this rule

---

[5]But, as noted in the previous footnote, query whether increasing "the risk of harm . . . beyond what [is] inherent in the sport" (*Campbell, supra,* 75 Cal.App.4th at p. 830) is the correct test given a coparticipant relationship.

applies whether the equipment is provided commercially or otherwise.[6] Thus, the Arizona Court of Appeals has ruled that a defendant who allowed his neighbor to use the defendant's defectively assembled sawhorse as the two were erecting a brick wall to enclose the defendant's carport could be liable for injuries sustained by the neighbor when the sawhorse collapsed. (*Ellis v. Caristi* (1977) 117 Ariz. 279 [572 P.2d 107, 108].) "The fact that the bailment is gratuitous does not change the rule," said the court, citing Restatement Second of Torts section 405. (572 P.2d at p. 108.)

This rule makes sense especially if one considers other possible scenarios. Thus, suppose that, on the day in question, not the towrope but a blade of the boat propeller broke off and injured appellant and, further, that expert testimony was adduced that proper maintenance would have prevented the break. Should respondent's conceded coparticipant status mandate summary judgment for him? Next, suppose that, instead of accepting the generosity of respondent on the day in question, appellant's parents had taken him to the same lake and *purchased* waterskiing and tubing recreation for him from a commercial operator, and that one of the operator's towropes broke resulting in the same injuries. Should the rule be that the commercial operator might be liable but a gratuitous supplier of the same equipment (e.g., respondent) not? Finally, suppose A wants to go mountain climbing and obtains a climbing rope from an experienced climber, B. Should B's possible exposure to liability for injuries sustained from a break in the rope depend on whether B (1) accompanies A on the climb or (2) receives compensation from A for the use of the rope? Under the rule articulated in sections 388 and 405 of the Restatement Second of Torts, we think the answer to all of these hypotheticals is "no" and, more importantly, that in all instances that is the correct outcome.

In this connection, we should stress that what is before us is not the issue of final imposition of liability on the defendant, but only the issue of whether summary judgment should have been granted in his favor on this record. That record, as noted, contains not one but two declarations by

---

[6]At oral argument, respondent's counsel suggested that this rule obtains only when the equipment was supplied commercially, citing *Harrold v. Rolling J Ranch* (1993) 19 Cal.App.4th 578, 585 [23 Cal.Rptr.2d 671]. We disagree; that case neither articulates nor implies any such limitation.

Respondent also relies on a "broken fishing line" case, *Mosca v. Lichtenwalter* (1997) 58 Cal.App.4th 551 [68 Cal.Rptr.2d 58], in which the court held that the primary assumption of risk doctrine permitted summary judgment against a plaintiff fisherman who was hit in the eye with a lead sinker attached to a line which had been stuck in a kelp bed, but which flew back when, allegedly, unsafely jerked by the defendant, another fisherman on the same boat. But in that case there was no allegation, or even a basis for an allegation, of a defective fishing line. As every fisherman (or ex-fisherman) can attest, fishing lines are *supposed* to break under the proper circumstances.

experts opining, among other things, that the towrope in question was both "very old" and frayed and that, in general, such ropes need to be replaced at least every two years.[7] Respondent himself testified he could not recall how or when his inner tube apparatus turned up among his boating and water sports equipment, and could not answer as to whether the device was more than five, or even 10, years old. Such testimony creates, in our view, a triable issue of fact as to whether, *qua* supplier of the equipment as distinguished from *qua* coparticipant in the sport of tubing, respondent owed appellant a duty of care to supply nondefective equipment.

## IV. DISPOSITION

The judgment is reversed.

Lambden, J., and Ruvolo, J., concurred.

A petition for a rehearing was denied February 8, 2000, and respondent's petition for review by the Supreme Court was denied April 12, 2000. Werdegar, J., was of the opinion that the petition should be granted.

---

[7]Contrast a commercial sporting enterprise case, *Ferrari v. Grand Canyon Dories, supra*, 32 Cal.App.4th at pages 256-257, where the court relied on uncontradicted expert testimony that the equipment involved (a river raft with an exposed metal frame) was state of the art to sustain a summary judgment based on primary assumption of risk.